UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NINA YODER                                                                                                    PLAINTIFF

v.                                                                                              CASE NO. 3:09-CV-205-S

UNIVERSITY OF LOUISVILLE, et al.                                                          DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court upon the cross-motions of plaintiff Nina Yoder ("Yoder") and defendants University of Louisville ("U of L" or, "University"), Dr. Ermalynn Kiehl ("Kiehl"), and Dr. Marcia Hern ("Hern") (hereinafter collectively, "Defendants") for summary judgment (DN 14; DN 17). The matter has been fully briefed (DN 18; DN 19) and is ripe for disposal. For the reasons that follow, Yoder's motion for summary judgment will be granted and Defendants' cross-motion will be denied.[1]

BACKGROUND

The undisputed relevant facts are these: Yoder was dismissed as a student from the U of L School of Nursing ("SON") due to a blog that she posted on her MySpace page. The blog post, entitled "How I Witnessed the Miracle of Life," ("Blog Post") was based on Yoder's experience with an obstetric patient whom she was assigned to follow through the birthing process as part of her course work. The Blog Post is reproduced in full, as follows:

> As part of my mother-baby clinical (99% of the time clinicals are a waste of my time) I was assigned to find a pregnant mother and follow her around. I didn't look far. If you have ever worked a 12-hour shift in the hospital, you'd know that 50%

---

[1]Yoder originally filed an emergency motion for preliminary injunction in this matter on March 13, 2009. By agreement of counsel, and upon order of the court, the matter was remanded from the court's docket on April 16. Yoder has now moved to renew her motion for temporary injunctive relief (DN 22). The motion will be denied as moot in light of the court's ruling herein.

of females there are at various stages of pregnancy. People say that there's something in the water. I say it's the shift - basically, she works 3 days and has 4 days to do everything else, including getting knocked up. That's how I got surprised with my own Creep - I was working nights in the ER. Never thought I'd have one, but there ya go. If your wife is infertile, send her to work at the hospital, she'll come back with triplets.

Anyway, I found my mom fairly easy - I just came to work and confronted one of the ladies. Good thing that it was her third pregnancy - and she had no problem with me being stuck to her like a tick to an ass, so I cordially invited myself to observe the glorious moment of The Popping.

Now, let's bust some myths.

### 1. "Pregnant women are beautiful"

No. Hell - no.
*Beautiful* pregnant women are beautiful, or more like, only slightly distorted with the belly (as was the case with my "mom"). Otherwise, pregnancy makes an ok-looking woman ugly, and an ugly woman - fucking horrifying.

### 2. "You're all glowing"

Oh really? Is that all the sweat from having to lug 35 extra lbs?

### 3. "Babies are God's little miracles"

I gotta admit, there is something freakishly fascinating with the fact that one bunch of coiled protein grows a tail, forms an army, and attacks another bunch of coiled protein (which gets released by signals from a whole lot of proteins and waits patiently in a soft bed of all sorts of other proteins), then 23 + 23 becomes 46, immediately gets determined whether it's an XX or XY, or XXY or XYY, or some retarded XXXY ... anyway, it's an amazing process. But IMHO these 'miracles' are demons sent to us from hell to torture us for the whole eternity.

4. "Children are such joy!"

Someone referred to having kids as like being pecked to death by chickens. I'll say that it's more like being ripped apart by rabid monkeys.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Last Friday I armed myself with a camera, and journeyed to the assigned hospital, where I met my wonderful lady, getting ready to pop. Since it was her third kid,

everyone expected her to shoot it out within 30 minutes. She was already getting induced by elephantine dose of Oxytocin (Mmmm, Oxytocin!)

I took my camera, put it on "Rec" and assumed the position.

45 minutes later, no baby.

1 hour 30 minutes later, no baby.

The anesthesiologist comes in and sets up my girl with an epidural. Having it done is one thing; watching someone else getting it done is another. The doc took out this teeny needle first and numbed her up. Then she took out this huge-ass 10 inch needle and jammed it into her spine!

I was watching the whole thing, with my face changing expressions like Louis De Funès'. But I guess everything went fine, because my 'mom' was back into position in no time, waiting for the Creep to show up.

3 hours later, no baby.

I'm looking at the mother with sheer disdain, she looks at me with sheer anger, but still - no baby.

I've got to go to work this evening, and I'm starting to cuss. I haven't slept in 36 hours, so I went to my car, got my blanket, kicked the nervous spouse out of the recliner, and went to sleep.

4 hours later she starts to throw up. I jump up, and turn my camera on again, assuming the position of a greyhound, right in between her legs.

... no baby.

5 hours.

6 hours.

7 hours.

My eyes are starting to feel like they're filled with sand, and my heart is starting to palpitate. The momma is throwing up, the daddy's stomach is growling and he's starting to bitch like a 14-year-old school girl in the mall.

8 hours later, the nurse comes in, checks the momma, and says, "ok, we're ready to push".

> FINALLY!!! I turn my camera on again. Two more nurses, and a woman doctor come in. They put my momma into a position of American Eagle, prop her up with pillows, and shine bright light at the cooch.
>
> The momma's family is sitting in the corner, shaking all over, with the two younger brothers of the baby, the in-laws, and the bitching spouse.
>
> At last my girl gave one big push, and immediately out came a wrinkly bluish creature, all Picasso-like and weird, ugly as hell, covered in god knows what, screeching and waving its tentacles in the air.
>
> 15 minutes later it turned into a cute pink itty bitty little baby girl. Mom was forgotten, the whole squacking family surrounded the new Creep; she was crowned with a pink cap, wrapped into a blanket and finally shut up with a teat.
>
> I came to work, overwhelmed with emotions and new knowledge and experience. I sat down, looked around and once again proved that women are FREAKING STUPID and don't learn from their past mistakes.
>
> I said: "I want another baby!!"
>
> The End.

Defendants' Motion for Summary Judgement, Exhibit 6.

Yoder posted the Blog on her MySpace page on February 2, 2009. Sometime thereafter, a nursing student informed Glenda Adams ("Adams"),[2] the childbearing course instructor, that students were discussing the Blog Post. On February 25, Adams contacted SON Associate Dean Kiehl and explained that she was concerned Yoder had revealed confidential information about the birth mother and her baby. Kiehl reviewed the Blog Post and contacted SON Dean Hern. On February 26, Kiehl and Hern reviewed the Blog Post and agreed that it violated the SON Honor Code Pledge ("Honor Code"), the childbearing course's Confidentiality Statement ("Confidentiality Agreement"), the course consent form executed by the birth mother ("Consent Form"), and, in

---

[2] Adams is not party to this suit.

general, the standards of the nursing profession.

> The Honor Code provides:
>
> I join my fellow students today to pledge my commitment to the highest ideal and academic standards of my education at the University of Louisville School of Nursing.
>
> I recognize I am entering a profession in which I have responsibility for the lives of others. With that responsibility comes accountability for my actions.
>
> Therefore, as a representative of the School of Nursing, I pledge to adhere to the highest standards of honesty, integrity, accountability, confidentiality, and professionalism, in all my written work, spoken words, actions and interactions with patients, families, peers and faculty.
>
> I pledge to work together with my peers and to support one another in the pursuit of excellence in our nursing education and to report unethical behavior.
>
> I will work to safeguard the health and welfare of clients who have placed their trust in me and will advocate for the client's best interest.
>
> I recognize that these responsibilities do not end with graduation, but are a lifelong endeavor.

*Id.* at Exhibit 2.

> The Confidentiality Agreement provides:
>
> I _____ do hereby agree to consider confidential any and all information entrusted to me throughout my clinical rotations while a student at the University of Louisville School of Nursing. This includes medical, financial, personal, and employment related information. I realize that information shared with others could bring harm to clients. Further I understand that proven violation of confidentiality of any such information may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing.

*Id.* at Exhibit 3.

> The Consent Form provides, in pertinent part:
>
> Any information shared with the named nursing student will be used by that student only for written/oral assignments. My name and my family's name will not be used in any written or oral presentation by the named student. I understand that

>information regarding my pregnancy and my health care will be presented in written or oral form to the student's instructor only.

*Id.* at Exhibit 4. Yoder bound herself in writing to uphold each of these agreements.

Kiehl and Hern agreed that Kiehl should meet with Yoder about the Blog Post. On February 26, Adams contacted Yoder and asked to meet with her the next morning. Adams did not give Yoder any specific reason for the meeting.

On February 27, Yoder arrived at the SON for what she thought would be a meeting with Adams. Instead, Yoder was greeted by Kiehl, Dr. Quinn Chipley ("Chipley"),[3] and two uniformed law enforcement officers.[4] Yoder was frisked for weapons and found not to have any on her person.[5] Kiehl confronted Yoder with a printout of the Blog Post and explained to her that it was a breach of the Honor Code and patient confidentiality. Once Yoder confirmed that she had authored the Blog Post, Kiehl informed her that she would recommend to Hern that Yoder be dismissed from the SON.

Yoder subsequently received a dismissal letter from Hern dated March 2. The letter stated that Yoder was being dismissed from the SON because her "internet postings regarding patient activities and identification as a University of Louisville School of Nursing student violates the nursing honor code which you pledged to uphold on September 7, 2008." *Id.* at Exhibit 8. The letter did not reference the Confidentiality Agreement. The letter explained that Yoder had the right to

---

[3] Chipley is a physician who provides counseling and psychological support to students.

[4] Because Kiehl had "read in [Yoder's] blogs issues about guns," Deposition of Dr. Ermalynn Kiehl, p. 24, she contacted U of L's Department of Public Safety ("DPS"). Officers of DPS recommended they be present at the meeting with Yoder.

[5] It should be noted that there is no evidence in the record to suggest that Yoder might have been armed. It is undisputed that Yoder has never brought any firearm onto University campus.

-6-

speak with Hern by telephone and to petition the SON's decision following the procedure established by the SON. The letter confirmed that Yoder was provided the instructions and procedural documents.

Pursuant to SON procedure, Yoder filed a petition with the Office of Student Services' Undergraduate Academic Affairs Committee ("Committee") for review of her dismissal. Under Committee practices, Yoder was not allowed to participate in the Committee's deliberations. The Committee reviewed Yoder's petition and determined that her dismissal should be upheld. Yoder was informed of the Committee's decision by letter from Kiehl dated March 9. The letter gave no information regarding appeal rights. The letter explained that University students who are dismissed by one enrollment unit are eligible to apply for admission to another unit. The letter referred Yoder to the Office of Student Services if she had any questions.

Yoder filed this civil rights action against U of L, as well as Kiehl and Hern in their official and individual capacities, pursuant to 42 U.S.C. § 1983 on March 12. Yoder specifically alleges that Defendants violated her First Amendment right to free speech by dismissing her from the SON based on the Blog Post. Yoder argues that the Honor Code is unconstitutionally broad and that the Confidentiality Agreement is unconstitutionally vague. Yoder further alleges that Defendants violated her Fourteenth Amendment right to due process by depriving her of the interest in her education without adequate notice and the opportunity to be heard.

Defendants assert that this is not a free speech case. They argue that Yoder violated her obligations as a nursing student and was dismissed from the SON program for those specific violations. They further contend that even if this were a free speech case, the Blog Post is not protected by the First Amendment. Defendants also allege that both the Honor Code and

Confidentiality Agreement are constitutional, and that Yoder was afforded all the due process to which she was entitled. Defendants additionally argue that this action is barred because Yoder failed to exhaust her University remedies and that they are immune from damages.

Yoder seeks summary judgment as to liability on her claims and a trial on the issue of damages. She seeks a declaratory judgment ruling that both the Honor Code and Confidentiality Agreement are unconstitutional and permanent injunctive relief prohibiting their enforcement. Yoder seeks immediate injunctive relief ordering her return to classes.

The court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute also must be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a

light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

As a preliminary matter, this action is not barred for failure to exhaust University remedies. Defendants argue that because U of L policy permits students who believe they have been treated unfairly, discriminated against, or have had their rights abridged to initiate a grievance within one year from the event giving rise to the complaint, Yoder's claims are not ripe for failure to file a grievance with the University before filing this action. Defendants' Motion for Summary Judgement at Exhibit 10. However, the law is clear that exhaustion is not a prerequisite to maintenance of an action under § 1983. *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 500-501 (1982); *Lawrence v. Chancery Court of Tennessee*, 188 F.3d 687, 692 (6th Cir. 1999).

This case will be decided on the merits. However, it will not be decided on constitutional grounds. A fundamental rule of judicial restraint requires that federal courts, prior to reaching any constitutional questions, must first consider any nonconstitutional grounds for a decision. *Jean v. Nelson*, 472 U.S. 846, 854, 105 S. Ct. 2992, 86 L. Ed. 2d 664 (1985). As Defendants correctly argue, this is not ultimately a free speech case. Nor is it fundamentally a matter of due process. There is no need, therefore, for the court to discuss the constitutional questions raised by Yoder's claims.

This case presents a matter of contract interpretation: Yoder was dismissed from the SON because Defendants found that her Blog Post violated both the Honor Code and the Confidentiality Agreement. However, upon review of the relevant texts, the court finds that the Blog Post does not violate either of these two agreements. Therefore, there is no basis for Defendants' dismissal of Yoder from the SON.

Defendants argue that the Blog Post violates the "confidentiality" provision of the Honor Code, as well as the Confidentiality Agreement, because it contains "identifying information" about the birth mother. Depo. of Kiehl at 79. Neither "confidentiality" nor "identifying information" is defined anywhere within the SON's rules and regulations. *Id.* at 82. However, the Confidentiality Agreement provides that confidential information "includes medical, financial, personal, and employment related information." Defendants' Motion for Summary Judgment at Exhibit 3. Defendants assert that the Blog Post contains the following identifying information about the birth mother: the number of her children; the date that she was in labor; her behaviors; the treatment that she underwent (an epidural); her reaction to labor (vomiting); and the reactions of her family. Depo. of Kiehl at 79.

While this information appearing in the Blog Post is arguably "medical" and/or "personal," it does not "identify" the birth mother. The Blog Post does not disclose the birth mother's name, address, social security number, or the like. It does not disclose her age, race, or ethnicity. The Blog Post does not contain "financial" or "employment related information"[6] about the birth mother. It does not disclose where she was in labor.

In sum, the Blog Post does not contain information that could possibly lead to the discovery of the birth mother's identity. Therefore, the Blog Post does not violate the confidentiality provision of the Honor Code by Defendants' own terms, nor the Confidentiality Agreement. If the SON wishes for its students' confidentiality obligations to extend to the giving of non-identifiable

---

[6]To the extent that "Anyway, I found my mom fairly easy - *I just came to work and confronted one of the ladies*," Defendants' Motion for Summary Judgement, Exhibit 6 (emphasis added), constitutes "employment related information" about the birth mother, it does not distinguish her identity.

information about patients, it must give fair notice.

Defendants argue that the Blog Post violates the "professionalism" provision of the Honor Code. "Professionalism" is not defined anywhere within the SON's rules and regulations. Depo. of Kiehl at 75-76. Kiehl could not provide a definition of "professionalism" when asked at her deposition. *Id.* When terms expressed in a formal document are undefined, the court gives them their ordinary meaning. *See*, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S. Ct. 788, 130 L. Ed. 2d 682 (1995). Defendants specifically argue that the Blog Post violates the professionalism provision of the Honor Code – above and beyond by disclosing confidential information about the birth mother – because of the vulgar and unprofessional manner in which it was presented.

The court does not disagree with Defendants that the Blog Post is vulgar. It is generally distasteful and, in parts, objectively offensive. However, the Blog Post is not "unprofessional." Rather, it is entirely *non-professional*, and therefore it falls outside the purview of the Honor Code. Yoder did not post the Blog "as a representative of the School of Nursing." Defendants' Motion for Summary Judgement at Exhibit 6. Moreover, the Blog Post is not "written work, spoken words, actions [or] interactions with patients, families, peers [or] faculty." *Id.* It is simply a crude attempt by Yoder to be humorous in describing an anonymous prolonged labor and delivery. It was written without any clearly intended audience and posted on Yoder's own personal MySpace page. That the Blog Post was technically accessible to the public does not fundamentally change the nature of the writing.

To be sure, Yoder's attempt at humor was an abject failure. Her observations on women, children, motherhood and the birthing process are, for the most part, crass and uncouth. The court most certainly does not approve of the language used. However, to be fair, the Blog Post does end

with a reversal of attitude and a departing message that is positive – life-affirming, even – if perversely so. Yoder writes that she is "overwhelmed with emotions and new knowledge and experience," and ultimately concludes that she wants another baby of her own. *Id.*

Regardless, the court does not judge the Blog Post on its comedic or literary merit. Despite what we, or Defendants, may think of it, the Blog Post does not violate the professionalism provision of the Honor Code because it was not created or used in any professional context. Again, if the SON wishes for the professionalism affirmation in the Honor Code to apply to every act or all conduct of a SON student everywhere and at all times in all contexts, it must give fair notice by explaining such obligation clearly. In this case, the SON has taken a crude attempt at humor done in a non-professional context, and attempted to shoe-horn it into a violation of a "professionalism" promise which speaks to conduct as a "representative of the School of Nursing." That square peg doesn't fit the round hole which the facts disclose. Accordingly, there is no basis for Defendants' dismissal of Yoder from the SON.

Yoder must be reinstated as a student at the SON and allowed to return to classes immediately. Because Yoder succeeds on her motion for summary judgment on nonconstitutional grounds, we need not address liability for damages under 42 U.S.C. § 1983.

## CONCLUSION

Because the court finds that there are no genuine issues of fact and Yoder is entitled to summary judgment as a matter of law, Yoder's motion for summary judgment will be granted and Defendants' cross-motion will be denied.

A separate order will be entered herein this date in accordance with this opinion.

August 3, 2009



Charles R. Simpson III, Judge
United States District Court

-12-