UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NINA YODER                                                          PLAINTIFF

v.                                            CIVIL ACTION NO. 3:09-CV-00205

UNIVERSITY OF LOUISVILLE, *et al.*                                  DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment made by plaintiff

Nina Yoder ("Yoder") (DN 45) and by defendants University of Louisville, Dr. Marcia Hern

("Hern"), and Dr. Ermalynn Kiehl ("Kiehl") (DN 51). For the reasons stated herein, the defendants'

motion for summary judgment will be granted and Yoder's motion for summary judgment will be

denied.

### BACKGROUND

Yoder was a student at the U of L School of Nursing ("SON"). As part of her transition to

the upper division courses at SON, Yoder signed an Honor Code pledge providing as follows:

> I join my fellow students today to pledge my commitment to the highest ideal and
> academic standards of my education at the University of Louisville School of
> Nursing.
>
> I recognize I am entering a profession in which I have responsibility for the lives
> ofothers. With that responsibility comes accountability for my actions.
>
> Therefore, as a representative of the School of Nursing, I pledge to adhere to the
> highest standards of honesty, integrity, accountability, confidentiality, and
> professionalism, in all my written work, spoken words, actions and interactions
> with patients, families, peers and faculty.

I pledge to work together with my peers and to support one another in the pursuit of excellence in our nursing education and to report unethical behavior.

I will work to safeguard the health and welfare of clients who have placed their trust in me and will advocate for the client's best interest.

I recognize that these responsibilities do not end with graduation, but are a lifelong endeavor.

Yoder took a childbearing clinical class. In conjunction with that class, Yoder signed a

Confidentiality Agreement, which provided as follows:

I _____ do hereby agree to consider confidential any and all information
entrusted to me throughout my clinical rotations while a student at the University of Louisville School of Nursing. This includes medical, financial, personal, and employment related information. I realize that information shared with others could bring harm to clients. Further I understand that proven violation of confidentiality of any such information may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing.

As part of the childbearing class, Yoder was assigned to find an obstetric patient, whom

she would follow through the birthing process. When Yoder found a patient to follow, Yoder and

the patient signed a Consent Form, which provided in pertinent part:

Any information shared with the named nursing student will be used by that student only for written/oral assignments. My name and my family's name will not be used in any written or oral presentation by the named student. I understand that information regarding my pregnancy and my health care will be presented in written or oral form to the student's instructor only.

The patient agreed to let Yoder watch her give birth. After being present for the labor and

delivery, Yoder wrote a blog post on her MySpace page. The blog post was entitled "How I

Witnessed the Miracle of Life." The post is reproduced in full, as follows:

As part of my mother-baby clinical (99% of the time clinicals are a waste of my

- 2 -

time) I was assigned to find a pregnant mother and follow her around. I didn't look far. If you have ever worked a 12-hour shift in the hospital, you'd know that 50% of females there are at various stages of pregnancy. People say that there's something in the water. I say it's the shift - basically, she works 3 days and has 4 days to do everything else, including getting knocked up. That's how I got surprised with my own Creep - I was working nights in the ER. Never thought I'd have one, but there ya go. If your wife is infertile, send her to work at the hospital, she'll come back with triplets.

Anyway, I found my mom fairly easy - I just came to work and confronted one of the ladies. Good thing that it was her third pregnancy - and she had no problem with me being stuck to her like a tick to an ass, so I cordially invited myself to observe the glorious moment of The Popping.

Now, let's bust some myths.

**1. "Pregnant women are beautiful"**

No. Hell - no.
*Beautiful* pregnant women are beautiful, or more like, only slightly distorted with the belly (as was the case with my "mom"). Otherwise, pregnancy makes an ok-looking woman ugly, and an ugly woman - fucking horrifying.

**2. "You're all glowing"**

Oh really? Is that all the sweat from having to lug 35 extra lbs?

**3. "Babies are God's little miracles"**

I gotta admit, there is something freakishly fascinating with the fact that one bunch of coiled protein grows a tail, forms an army, and attacks another bunch of coiled protein (which gets released by signals from a whole lot of proteins and waits patiently in a soft bed of all sorts of other proteins), then 23 + 23 becomes 46, immediately gets determined whether it's an XX or XY, or XXY or XYY, or some retarded XXXY ... anyway, it's an amazing process. But IMHO these 'miracles' are demons sent to us from hell to torture us for the whole eternity.

4. "Children are such joy!"

Someone referred to having kids as like being pecked to death by chickens. I'll say that it's more like being ripped apart by rabid monkeys.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Last Friday I armed myself with a camera, and journeyed to the assigned hospital, where I met my wonderful lady, getting ready to pop. Since it was her third kid, everyone expected her to shoot it out within 30 minutes. She was already getting induced by elephantine dose of Oxytocin (Mmmm, Oxytocin!)

I took my camera, put it on "Rec" and assumed the position.

45 minutes later, no baby.

1 hour 30 minutes later, no baby.

The anesthesiologist comes in and sets up my girl with an epidural. Having it done
is one thing; watching someone else getting it done is another. The doc took out this teeny needle first and numbed her up. Then she took out this huge-ass 10 inch needle and jammed it into her spine!

I was watching the whole thing, with my face changing expressions like Louis De Funès'. But I guess everything went fine, because my 'mom' was back into position in no time, waiting for the Creep to show up.

3 hours later, no baby.

I'm looking at the mother with sheer disdain, she looks at me with sheer anger, but still - no baby.

I've got to go to work this evening, and I'm starting to cuss. I haven't slept in 36 hours, so I went to my car, got my blanket, kicked the nervous spouse out of the recliner, and went to sleep.

4 hours later she starts to throw up. I jump up, and turn my camera on again, assuming the position of a greyhound, right in between her legs.

... no baby.

5 hours.

6 hours.

7 hours.

My eyes are starting to feel like they're filled with sand, and my heart is starting to
palpitate. The momma is throwing up, the daddy's stomach is growling and he's

- 4 -

starting to bitch like a 14-year-old school girl in the mall.

8 hours later, the nurse comes in, checks the momma, and says, "ok, we're ready to push".
FINALLY!!! I turn my camera on again. Two more nurses, and a woman doctor come in. They put my momma into a position of American Eagle, prop her up with pillows, and shine bright light at the cooch. The momma's family is sitting in the corner, shaking all over, with the two younger brothers of the baby, the in-laws, and the bitching spouse.

At last my girl gave one big push, and immediately out came a wrinkly bluish creature, all Picasso-like and weird, ugly as hell, covered in god knows what, screeching and waving its tentacles in the air.

15 minutes later it turned into a cute pink itty bitty little baby girl. Mom was forgotten, the whole squacking family surrounded the new Creep; she was crowned with a pink cap, wrapped into a blanket and finally shut up with a teat.

I came to work, overwhelmed with emotions and new knowledge and experience. I sat down, looked around and once again proved that women are FREAKING STUPID and don't learn from their past mistakes.

I said: "I want another baby!!"

The End.

As a result of the blog post, a nursing student informed the course instructor, Glenda Adams, that students were discussing the post. Adams contacted SON Associate Dean Kiehl, who reviewed the blog post and contacted SON Dean Hern. Kiehl and Hern agreed that the blog post violated the SON Honor Code Pledge, the childbearing course's Confidentiality Agreement, and, in general, the standards of the nursing profession.

On February 26, 2009, Adams contacted Yoder and asked to meet with her the next morning. On February 27, Yoder arrived at SON for what she thought would be a meeting with Adams. Instead, she was greeted by Kiehl, two uniformed police officers, and a physician who provided counseling and psychological support to students. Yoder was frisked for weapons and

found not to have any.[1] Kiehl explained to Yoder that the blog post was a breach of the Honor

Code and patient confidentiality. Kiehl informed Yoder that she would recommend to Hern that

Yoder be dismissed from SON and that she was initiating the process to declare Yoder a

"persona non grata" on campus.

> Yoder received a dismissal letter from Hern dated March 2, which stated :
>
> It has been determined that your internet postings regarding patient activities and
> identification as a University of Louisville School of Nursing student violates the
> nursing honor code which you pledged to uphold on September 7, 2008. Upon
> evaluation of your demonstrated fitness to continue in the program in accordance
> with promulgated professional standards established by the School of Nursing,
> you are receiving an academic dismissal from the School of Nursing.

The letter further provided that Yoder had the right to speak with Hern by telephone and to

petition SON's decision. The letter confirmed that Yoder had the instructions and documents she

would need to do so.

> Yoder filed a petition with the Office of Student Services' Undergraduate Academic

Affairs Committee for review of her dismissal. Yoder was not allowed to participate in the

Committee's deliberations. The Committee upheld Yoder's dismissal.

> Yoder filed this action against U of L, as well as Kiehl and Hern in their official and

individual capacities. Pursuant to 42 U.S.C. § 1983, Yoder alleged violations of her First and

Fourteenth Amendments rights and asserted that provisions of the Honor Code and the

Confidentiality Agreement are unconstitutionally overbroad and vague.

> The parties filed cross-motions for summary judgment. In an order dated August 3, 2009,

this court granted Yoder's motion for summary judgment and denied defendant's motion for

---

[1] There is no evidence in the record suggesting that Yoder might have been armed, nor is
there any dispute that Yoder never brought any firearm onto the University campus.

summary judgment. In the accompanying memorandum opinion, the court explained that its decision was premised on nonconstitutional grounds, namely that the blog post did not actually violate the Honor Code or Confidentiality Agreement. Specifically, the blog post did not violate any confidentiality provision of the Code or Agreement because it did not contain any identifying information about the birth mother. Moreover, the blog post did not violate the professionalism provision of the Honor Code because the blog post was not created or used in any professional context. The court issued an injunction requiring Yoder's reinstatement as a student at SON.

U of L appealed the court's ruling. In a decision rendered April 8, 2011, the Sixth Circuit vacated the order granting Yoder summary judgment. *Yoder v. Univ. of Louisville*, 417 Fed. App'x 529 (6th Cir. 2011). The Sixth Circuit held that summary judgment was improperly granted on the nonconstitutional theory because Yoder had not alleged in her complaint nor litigated in her summary judgment motion the nonconstitutional theory. *Yoder*, 417 Fed. App'x at 530. The Sixth Circuit declined to rule on the constitutional issues, instead remanding the case to this court. *Id.*

On May 5, 2011, the defendants moved to dismiss the complaint as moot. The defendants asserted that during the pendency of the appeal, pursuant to this court's injunction, Yoder had been reinstated as a student at SON and had completed her coursework and obtained her degree. On November 9, 2011, this court held that Yoder's claim for damages under 42 U.S.C. § 1983 had not been rendered moot.

Yoder has against sought summary judgment on the issue of liability, with a trial on the issue of damages. Defendants have also again cross-moved for summary judgment.

# ANALYSIS

## I. The Applicable Standards of Review

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which the jury could reasonably find for the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

## II. The University of Louisville and Kiehl and Hern in Their Official Capacities

Under the Eleventh Amendment to the United States Constitution, this court retains no jurisdiction over claims asserted directly against the Commonwealth or its instrumentalities for monetary remedies. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-431 (1997); *Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974); *Martin*, 541 F.2d at 1173-1174. The University of Louisville is a state institution. *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 960 (1986); *Martin v. Univ. of Louisville*, 541 F.2d 1171, 1174 (6th Cir. 1976); *cf. Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993) (holding that the University of Kentucky is an arm of the state). Thus, Yoder's § 1983 claims against the University for monetary damages must be dismissed.

- 8 -

Further, a claim against a state official in his or her official capacity is, "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, a state official in his or her official capacity is entitled to sovereign immunity in suits for money damages under § 1983. *Will*, 491 U.S. at 71; *Kentucky v. Graham*, 473 U.S. at 166-167; *Stewart*, 2005 WL 3088543, at *5. Therefore, Yoder's § 1983 claims for monetary damages against Kiehl and Hern in their official capacities must also be dismissed. *See Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d at 960.

### III. Kiehl and Hern in Their Individual Capacities

#### A. Official Immunity

"[G]overnment officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). In confronting claims of qualified immunity on summary judgment, courts must decide whether the facts, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: 1) the defendant violated a constitutional right; and 2) the right was clearly established. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light o f the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

#### B. First Amendment

Yoder claims that the defendants violated her right to free speech "by retaliating against her and otherwise restricting her right to publish information." Yoder argues that she is entitled to summary judgment on her First Amendment claim because her speech was not of the type of

entirely unprotected speech such as fighting words or true threats that receive no First Amendment protections. She further contends that the defendants engaged in viewpoint-based discrimination by punishing her for her speech.

The defendants assert that this is not a case about the First Amendment, because SON's purpose is to educate students in how to become nurses, and Yoder was dismissed for clearly disregarding those teachings, not for her viewpoint. In that vein, the defendants contend that, by signing the Honor Code, Confidentiality Agreement, and Consent Form, Yoder waived her First Amendment right to post the information she did regarding the live birth. The defendants also argue that, even analyzing Yoder's claim under the First Amendment, it fails because schools are entitled to regulate non-classroom "curricular" speech for legitimate pedagogical concerns, and Yoder's speech falls into that category.

For a plaintiff to prevail on a First Amendment retaliation claim, the plaintiff must ultimately prove: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

Yoder had no constitutional right to post information pertaining to the live-birth she witnessed in conjunction with her childbearing course in a public forum. In exchange for the opportunity to observe the birth-mother's pregnancy-related health care, Yoder and the birth-mother signed the Consent Form providing, "I understand that information regarding my pregnancy and my health care will be presented in written or oral form to the student's instructor

only." The last sentence of the Consent Form makes plain that Yoder agreed not to disseminate any information about the patient's pregnancy or health care to anyone other than the instructor.

In her motion papers, Yoder appears to agree that the various forms she signed prohibited her from publishing certain information about the birth-mother, but argues that she only agreed to limit dissemination of confidential information. And, pointing to this court's prior opinion holding that Yoder did not divulge any confidential information and thus did not violate the Confidentiality Agreement or the confidentiality provision of the Honor Code, Yoder argues that she had a clearly established right to post non-identifying information about the birth she witnessed in connection with her class.

However, while the Confidentiality Agreement and the confidentiality provision of the Honor Code may not have been violated by Yoder's blog post, nothing about the language of the Consent Form signed by Yoder and the birth-mother suggested that the information Yoder was agreeing not to disseminate was limited to confidential information. Yoder's internet posting was in clear violation of the language of that Consent Form. The blog post described, in intimate detail, the labor and delivery that Yoder witnessed. The post noted medical treatment the birth-mother received, such as an epidural, and described other health-related issues, such as the mother's vomiting prior to giving birth. Certainly, that was information about the mother's pregnancy and health care, and it was presented in written form on a publicly-accessible internet site, rather than "only" to Yoder's instructor. Because Yoder herself agreed not to publicly disseminate the information that she posted on the internet, she is not entitled to now claim that she had a constitutional right to do so. *See generally Snepp v. United States*, 444 U.S. 507 (1980) (rejecting First Amendment challenge where CIA employee had agreed not to publish any

information related to the agency without submitting it for clearance first and then published

unclassified information without properly submitting it for review).

Moreover, the limitations on her speech to which Yoder agreed as part of her clinical

course were related to legitimate pedagogical concerns. The purpose of SON is to educate

prospective nurses. To the extent that SON believes the best practice for nurses is to entirely

eschew public discussion of particular patients' health care, even if no confidential information

is being disclosed, SON is entitled to teach that. Indeed, "[c]ourts have traditionally given public

educational institutions, especially colleges and graduate schools, wide latitude to create

curricula that fit schools' understandings of their educational missions." *Kissinger v. Bd. of*

*Trustees of Ohio St. Univ.*, 5 F.3d 177, 181 (6th Cir. 1993) (citing *Doherty v. S. Coll. of*

*Optometry*, 862 F.2d 570, 576 (6th Cir. 1988)). The deference due to colleges' determinations of

what is appropriate in their curricula is particularly acute in the case of schools in the health care

field "when the conferral of a degree places the school's imprimatur upon the student as

qualified to pursue his chosen profession." *Doherty*, 862 F.2d at 576.

Moreover, it is understandable that SON would be worried about the effect of a student's

public discussion of a patient's health care on SON itself. SON may very well be worried about

its ability to obtain willing participants for its clinics in the future when one of its students, after

agreeing not to discuss a patient's health care, writes a lengthy internet posting concerning the

patient's labor and delivery of a baby.

Additionally, the limitations on Yoder's speech imposed by the agreement she and the

birth-mother signed were no broader than were needed in light of the legitimate pedagogical

concerns of the school. For instance, nothing about the Consent Form–or any other

agreement–limited Yoder's right to engage in discussions of her more general views on pregnancy, or any other issue for that matter. The Consent Form only stated that Yoder was agreeing not to discuss the pregnancy and health care of the specific patient who was agreeing in return to let Yoder follow her. In fact, as Yoder herself points out, a review of her classmates' blogs or social media pages revealed that several of them had engaged in course language or had expressed thoughts or posted pictures to which persons with delicate sensibilities may take offense. Nonetheless, when Kiehl was questioned about those internet postings in her deposition, she stated that the postings would not violate school policies, in that they were unrelated to particular patients. Thus, it is apparent that SON was not using its policies to regulate all aspects of its students' lives, but only those that were connected to the school's requirements.

Yoder also complains that the terms "confidentiality" and "professionalism," as contained in the Honor Code and Confidentiality Agreement, are overly broad and vague. Her argument with respect to the word "confidentiality" is premised on the contention that she did not violate the birth-mother's confidentiality, but both Kiehl and Hern found that she did. And, with respect to "professionalism," Yoder complains that it lends itself to arbitrary enforcement because, for instance, the defendants believed her internet posting to be unprofessional but did not find other student's coarse or possibly offensive postings to be unprofessional.

However, in light of this court's finding that Yoder signed a Consent Form prohibiting her entirely from discussing the patient's pregnancy and health care, even without reference to confidential information, there is little reason for this court to consider whether those provisions of the Honor Code and Confidentiality Agreement are overbroad or vague. That conclusion is compelled all the more by the fact that both the Honor Code and the Confidentiality Agreement

- 13 -

have obvious pedagogical purposes related to the objectives of SON, and, as noted above, courts

must be deferential to a professional school's choice of curricular matters. Further, this court

notes that, having finished her nursing degree already, Yoder does not face any future

applications of the Honor Code and Confidentiality Agreement.

In short, in exchange for the opportunity to follow the birth-mother, Yoder agreed not to

publicly disclose any information about the birth-mother's pregnancy or health care. And, SON

had a legitimate pedagogical purpose in requiring that its students agree to that condition with

the patients they were to follow. In light of that, Yoder cannot now complain that she had a First

Amendment right to publish on the internet the information she agreed not to reveal. Thus, the

defendants are entitled to summary judgment on Yoder's First Amendment claim.

B. Due Process

*Procedural Due Process*

Yoder claims that the defendants violated her right to procedural due process when she

was dismissed. To establish a violation of procedural due process, a plaintiff must prove that

they (1) were deprived of a protected property or liberty interest (2) without due process. *Bd. of*

*Regents v. Roth*, 408 U.S. 564, 569-570 (1972). The parties do not dispute that Yoder can prove

that she was deprived of a protected interest. Thus, this court will turn to the question of whether

Yoder received the amount of process she was due when she was dismissed.

In assessing claims of denial of procedural due process for dismissal from an institution

of higher education, courts make an analytical distinction between academic and disciplinary

dismissals. *See  Bd. of Curators v. Horowitz*, 435 U.S. 78, 86 (1978). In *Goss v. Lopez*, the

Supreme Court, held that a student facing suspension for 10-days from a public school was

- 14 -

entitled to "effective notice and [an] informal hearing permitting the student to give his version of the events." 419 U.S. 565, 582-83 (1975). Further, the Court noted that longer suspensions or expulsions "may require more formal procedures." *Id.* at 584.

By contrast, in the case of an academic dismissal, the university need not hold a hearing at all. *Horowitz*, 435 U.S. at 89-91. That is because academic decisions, particularly in the context of faculty judgments concerning the ability of a student to perform adequately as a professional, are "by . . . nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision," and are "not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90. "In the case of an academic dismissal or suspension from a state educational institution, when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Ku*, 322 F.3d at 436.

Here, the process provided to Yoder was fairly minimal. Upon learning of the blog post, Kiehl met with Hern. They reviewed the blog post and determined that the post breached the Honor Code, Confidentiality Agreement, and the professional standards for nurses. Then, on February 28, 2009, Kiehl met with Yoder to discuss the blog post. Yoder was not informed of the nature of the meeting prior to her arrival. In their depositions, Yoder and Kiehl have varying recollections of the specifics of the meeting, but both agree that Kiehl informed Yoder that Kiehl believed the blog post breached the Honor Code and violated the confidentiality of the patient, and further told Yoder that she either was or could be dismissed and was going to be a "persona non grata" on campus. After Kiehl and Yoder's meeting, Kiehl met with Hern, who had the

ultimate decision-making authority. Hern concurred with Kiehl's recommendation to dismiss Yoder and, on March 2, sent a letter notifying Yoder of her academic dismissal. The letter also provided that Yoder could speak with Hern by telephone or seek review of the decision following established procedures. Yoder did so by submitting a written petition, which was reviewed and denied by the Committee. There was a further grievance procedure available, but Yoder did not undertake it.

It is hard for this court to see any way that the procedures used to dismiss Yoder would have complied with the procedures required in the context of disciplinary dismissals. After all, even if the meeting could be considered a hearing for Yoder to provide her version of events prior to being dismissed, it is undisputed that she did not receive any notice of the nature of the meeting prior to its occurrence. Thus, under clearly established constitutional law, the process Yoder received was insufficient for a disciplinary dismissal.

On the other hand, under the much laxer procedural due process requirements for academic dismissals, the undisputed facts show that Yoder received adequate process. Kiehl met with Yoder and fully informed Yoder of the faculty's dissatisfaction with Yoder's performance. Moreover, Kiehl and Hern met prior to Kiehl's meeting with Yoder and discussed the blog post as it related to Yoder's fitness to be a nurse. Kiehl and Hern also met after the meeting between Kiehl and Yoder to further discuss the issue. Finally, Yoder availed herself of the chance to petition to the Undergraduate Academic Affairs Committee, which rejected her petition and agreed with Hern's determination. Given that Kiehl and Hern met multiple times to discuss the dismissal, and that the Academic Affairs Committee then affirmed the dismissal after reviewing

Yoder's petition, the decision to dismiss Yoder was "careful and deliberate." *See Ku*, 322 F.3d at 436.

Thus, the outcome of the parties' cross-motions for summary judgment on the procedural due process point turns on the issue of whether the dismissal was academic or disciplinary. In Hern's March 2, 2009, letter informing Yoder of her dismissal, she explicitly stated that the dismissal was "academic" and was premised on an "evaluation of [her] demonstrated fitness to continue in the program in accordance with promulgated professional standards established by [SON]." The defendants, inasmuch as they found in their professional opinions that Yoder had violated the professional standards of the nursing profession, were on solid ground to conclude that they were academically dismissing Yoder.

As the defendants note, academic dismissals can be based on more than objective grading criteria. Especially in the context of a professional program such as nursing, a student's competence to comply with the accepted standards of the profession are obviously important factors in assessing the student from an academic standpoint. *See Horowitz*, 435 U.S. at 91 n.6 ("Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness.");  *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003) (noting that such qualities as a student's ethical behavior and interpersonal relationships with medical colleagues, patients, and patient's families are relevant academic considerations); *Firester v. Bd. of Governors*, 1990 WL 99493, at *3 (6th Cir. 1990) ("No less than personal hygiene and timeliness, proper attitudes toward patients are important factors in determining whether a student will be a good doctor."); *see also Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005)

(academic dismissal from residency program for dishonesty during application process where residency program director "made a professional judgment" that the dishonesty made the resident unfit to be a doctor); *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (dismissal was academic where it was based on reasons related to student's "fitness to perform as a doctor").

Yoder argues that, despite Hern's explicit representation that Yoder was being academically dismissed, the dismissal should be deemed disciplinary because the dismissal was premised on the allegation that she violated a code of conduct–the Honor Code–and the Confidentiality Agreement. However, given that the defendants are entitled to qualified immunity, it is not enough for Yoder to show that the defendants could have dismissed her on disciplinary, rather than academic, grounds. Rather, Yoder must show that the defendant's decision to provide her with sufficient due process only for an academic dismissal was objectively unreasonable. But, in light of the cases cited above holding that academic dismissals encompass dismissals premised on a professional judgment that a student's actions rendered the student unfit to be a professional in a particular field, Yoder is unable to show that the determination to provide her only the process she was due for an academic dismissal was unreasonable. *See Stevenson v. Owens St. Comty. Coll.*, 562 F. Supp. 2d 965, 970-971 (N.D.Ohio 2008) (qualified immunity for defendants where they were objectively reasonable in providing sufficient due process for academic dismissal to sonography student who failed to protect patient confidentiality). Therefore, the defendants are entitled to summary judgment on the procedural due process claim.

*Substantive Due Process*

Yoder also asserts that her substantive due process rights were violated by her dismissal. The defendants are entitled to summary judgment on that claim because Yoder's interest in her nursing education is not an interest protected by substantive due process. The interests protected by substantive due process are much narrower than those protected by procedural due process. *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-250 (6th Cir. 2003). In *Bell v. Ohio State University*, the Sixth Circuit rejected the notion that substantive due process protects a medical student's interest in continuing education. 351 F.3d at 249-51. Subsequently, in an unpublished opinion that is directly on point, the Sixth Circuit held that a nursing student's "interest in her nursing education is not protected by substantive due process." *Rogers v. Tenn. Bd. of Regents*, 273 F. App'x 458 (6th Cir. 2008).

## CONCLUSION

The defendants' motion for summary judgment will be granted, Yoder's motion for summary judgment will be denied, and this action will be dismissed.

A separate order will issue in accordance with this opinion.

March 30, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

- 19 -